WO

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

ANNETTE J. NGANJE,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　Plaintiff,　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　vs.　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
CVS RX SERVICES, INC.,　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)　　No. 2:13-cv-2327-HRH
　　　　　　　　　　　　Defendant.　　　)
_____)

### O R D E R

### Motion for Summary Judgment

Defendant moves for summary judgment.[1] This motion is opposed.[2] Oral argument was requested and has been heard.

### Facts

Plaintiff is Annette J. Nganje.  Defendant is CVS Rx Services, Inc.

_____

[1]Docket No. 43.

[2]Docket Nos. 48-50.

Plaintiff is "black in color, African in race, and is originally from Cameroon, West Africa."[3]  Plaintiff began working for defendant as a pharmacist in 2005.  Plaintiff worked for defendant in Minnesota until 2007, at which time she and her family moved to Arizona. Plaintiff continued to work for defendant as a full-time Staff Pharmacist[4] after moving to Arizona.  Plaintiff primarily work at Store No. 1719, which is in Queen Creek, Arizona. Plaintiff believes that she was the only black, African pharmacist in the district in which she worked in Arizona.[5]

John Cerni, who at the time was a Pharmacy Supervisor, participated in the decision to approve plaintiff's transfer to Arizona.[6]  Cerni was aware of plaintiff's race, color and national origin at that time.[7]  Plaintiff testified that in the fall of 2008, she had to take an unpaid leave of absence from work because Cerni mishandled her immigration documents.[8]

---

[3]First Amended Complaint at 3, ¶ 10, Docket No. 20.

[4]Declaration of Brad Dudley (dated May 1, 2015) at 2, ¶ 3, Exhibit A, Defendant's Reply Memorandum [etc.], Docket No. 51.

[5]Videotaped Deposition of Annette Enanga Nganje at 290-291, Exhibit A, Plaintiff's Response to Motion for Summary Judgment, Docket No. 49.

[6]Nganje Deposition at 42-45, Exhibit A, Defendant's Motion for Summary Judgment, Docket No. 43.

[7]Id. at 58:5-8.

[8]Id. at 259:19-23.

On January 6, 2010, plaintiff was given a "Last and Final Written Coaching and Counseling" for poor customer service and inappropriate behavior by her supervisor, Ray Umbarger.[9]  This discipline was based on a January 6, 2010 complaint from a customer about plaintiff's "lack of customer service," a January 3, 2010 complaint from a customer that plaintiff "was very rude," a December 29, 2009, complaint from a customer about plaintiff's unwillingness to help him, and a December 27, 2009 complaint from a customer about plaintiff being "very rude."[10]  Plaintiff refused to sign the coaching and counseling form.[11]

On March 2, 2010, plaintiff received a compliment from a customer who called her a "very kind lady."[12]  On March 3, 2010, Umbarger sent plaintiff an email thanking her for "everything she does" after a customer reported that plaintiff "was just wonderful to us. She was so friendly, kind, polite and helpful."[13]

---

[9]Last and Final Written Coaching and Counseling Form, Exhibit 13, Nganje Deposition, Exhibit A, Defendant's Motion for Summary Judgment, Docket No. 43.

[10]Id.

[11]Id. at CVS 0133.

[12]Exhibit B at CVS 0540, Plaintiff's Response to Motion for Summary Judgment, Docket No. 49.

[13]Id. at CVS 0539.  Plaintiff received other customer compliments in 2008 and 2009. Id. at CVS 0536, 0538 & 0541.

On May 4, 2010, Umbarger received an email compliment from a customer about how "amazing" the pharmacy staff was, especially "Chris, Rachel, and RPH Annette."[14] On May 10, 2010, another customer called to compliment the pharmacy staff, including plaintiff, calling them "wonderful."[15]

On May 21, 2010, Sandra Finn, the pharmacist in charge of Store 5891, completed a "Floater Evaluation" after plaintiff worked in her store the day before.[16] Finn wrote that "Rx's left in que [sic], not completed. [T]ransfer RX left, which was received in afternoon. #3 schedule ... Rx's left for next day, received in afternoon. [T]echs claim she talks too much. [T]oo much talk, no action. Irritating to co-workers."[17] Finn indicated that she would not want plaintiff as a permanent employee in her store nor would she want plaintiff to fill in at her store again.[18]

On July 8, 2010, Umbarger sent plaintiff an email regarding a compliment from a customer who said she was "wonderful."[19] On July 12, 2010, plaintiff received another

_____

[14]Id. at CVS 0544.

[15]Id. at CVS 0546.

[16]Floater Evaluation, Exhibit 14, Nganje Deposition, Exhibit A, Defendant's Motion for Summary Judgment, Docket No. 43.

[17]Id.

[18]Id.

[19]Exhibit B at CVS 0543, Plaintiff's Response to Motion for Summary Judgment,
(continued...)

compliment from a customer who remarked on her pleasant experience and said that plaintiff was "very informative."[20]   On August 3, 2010, Umbarger emailed plaintiff regarding a compliment from a customer who stated that plaintiff "does an excellent superb job."[21]

On September 28, 2010, Umbarger emailed plaintiff regarding a complaint from the office manager at a doctor's office who said that plaintiff refused to talk to her and then screamed at her over the phone.[22]

On October 1, 2011, Umbarger attempted to give plaintiff a "Last and Final Coaching and Counseling" for again being insubordinate and argumentative with a Front-Store associate.[23]   Umbarger wrote that Dan Mott, the store manager, had attempted to inform plaintiff about a new requirement for issuing gift cards and plaintiff "proceeded to be insubordinate and argumentative in front of Technician as well as customer(s)...."[24]

---

[19](...continued)
Docket No. 49.

[20]Id. at CVS 0547.

[21]Id. at CVS 0545.

[22]Exhibit 15, Nganje Deposition, Exhibit A, Defendant's Motion for Summary Judgment, Docket No. 43.

[23]Exhibit 16, Nganje Deposition, Exhibit A, Defendant's Motion for Summary Judgment, Docket No. 43.

[24]Id.

Umbarger avers that plaintiff "told Mott that he needed her permission to enter the pharmacy"[25] and that when he "approached [p]laintiff to discuss the incident with her, she began yelling and screaming at me and refused to let me speak to her[.]"[26]  Umbarger told plaintiff "that th[e] meeting was over and that she must go home because she was suspended until a decision could be made with regard to her continued employment."[27]  Plaintiff testified that she was issuing gift cards when a customer transferred a prescription, which was according to CVS policy, and that she would issue gift cards "if a customer was angry" but that she "made sure I told the supervisor or my PIC before I issued any gift card."[28]

On October 5, 2011, Umbarger gave plaintiff an "Initial Coaching and Counseling" for consistently opening the pharmacy late; for falling behind on her work load and thus

---

[25]Declaration of Ray Umbarger at 2, ¶ 3, Exhibit C, Defendant's Motion for Summary Judgment, Docket No. 43.

[26]Id.

[27]Email from Umbarger to Steve Barney, Mike Huffstuttler, and Brad Dudley, Exhibit 2, Umbarger Declaration, Exhibit C, Defendant's Motion for Summary Judgment, Docket No. 43.

[28]Nganje Deposition at 142:17-25, Exhibit A, Plaintiff's Response to Motion for Summary Judgment, Docket No. 49.

having to stay late, which forced the front-store manager/supervisor to also have to stay late; and for continuing to issue gift cards to customers "as an offset of her slow service."[29]

Plaintiff testified that she got behind on her work because she had inadequate help, either in the form of too few pharmacy technicians or pharmacy technicians who had no medical background.[30]  Plaintiff claims that she would request additional technicians but defendant would refuse to provide technicians, even though other pharmacists were being given technicians upon request.  Plaintiff also makes much of the fact that defendant has "admit[ted] that [she] worked with pharmacy technicians who were not yet certified by the Arizona State Board of Pharmacy in 2013."[31]  But, in making that admission, defendant explained "that pharmacy technicians are not required to become certified by the Arizona State Board of Pharmacy upon commencing employment and, instead, have two years, sometimes up to four years, to obtain certification."[32]

---

[29]Exhibit 18, Nganje Deposition, Exhibit A, Defendant's Motion for Summary Judgment, Docket No. 43.

[30]Nganje Deposition at 96, 99, Exhibit A, Plaintiff's Response to Defendant's Motion for Summary Judgment, Docket No. 49.

[31]Responses to Requests for Admission at 5, Exhibit B, Plaintiff's Response to Motion for Summary Judgment, Docket No. 49.

[32]Id.

On March 2, 2012, Cerni gave plaintiff a "Coaching and Counseling" for her poor handling of a customer and for giving improper wait times for transfer prescriptions.[33] Plaintiff did not sign the coaching because she was "not comfortable" doing so "because of the information in" it.[34]  Plaintiff testified that this incident involved a drug seeking customer and that she followed CVS policy for dealing with such a customer,[35] which allows her to exercise her "professional and clinical judgment" when deciding whether to fill a prescription.[36]  Plaintiff contends that Cerni changed the Coaching and Counseling form after she pointed this policy out to him because he handwrote on the form that he was "concerned with Annette's inability to resolve the customer's issue not professional judgment."[37]  Plaintiff also contends that Cerni added previous unrelated disciplinary actions to the discipline, did not speak to her to get her side of the story before issuing the

---

[33]Exhibit 20, Nganje Deposition, Exhibit A, Defendant's Motion for Summary Judgment, Docket No. 43.

[34]Id. at CVS 0123.

[35]Nganje Deposition at 185, Exhibit A, Plaintiff's Response to Motion for Summary Judgment, Docket No. 49.

[36]Exhibit B at CVS 0555, Plaintiff's Response to Motion for Summary Judgment, Docket No. 49.

[37]Exhibit 20 at CVS 0118, Nganje Deposition, Exhibit A, Defendant's Motion for Summary Judgment, Docket No. 43.

discipline, and failed to consider the pharmacy tech's version of what happened, which supported her contention that the customer was drug seeking.[38]

On April 23, 2012, Jennifer Vucson, plaintiff's pharmacy supervisor, sent plaintiff an email sharing a "great compliment" that plaintiff had received from a customer.[39]

On or around May 1, 2012, Cerni and Vucson gave plaintiff her 2012 Performance review. Vucson rated plaintiff's performance as "needs improvement" and wrote that plaintiff "needs to improve on her communication skills with her team and front store team. She has a passion for customers; but the way she communicates with her team and expectations of front store doesn't correspond to the expectations of other team members."[40] Although Cerni "did not conduct the reviews of other employees at the Store[,]"[41] Cerni and Vucson aver that plaintiff's performance review was not the only one Cerni attended that spring.[42]

---

[38]Exhibit B at CVS 0552, Plaintiff's Response to Motion for Summary Judgment, Docket No. 49.

[39]Id. at CVS 0537.

[40]Exhibit 21 at CVS 0444, Nganje Deposition, Exhibit A, Defendant's Motion for Summary Judgment, Docket No. 43.

[41]First Amended Complaint at 4, ¶ 24, Docket No. 20 and Defendant's Answer thereto, Docket No. 33 at 4, ¶ 24.

[42]Declaration of John Cerni (dated February 27, 2015) at  2, ¶ 3, Exhibit D; Declaration of Jennifer Vucson (dated March 3, 2015) at 2, ¶ 3, Exhibit E; Defendant's Motion for Summary Judgment, Docket No. 43.

On November 12, 2012, a complaint was received from a pharmacy technician about plaintiff, in which the technician "alleged that [p]laintiff was creating an 'extremely hostile environment' by making negative comments, yelling, and making fun of him in front of customers.  He also said that [p]laintiff is always 'saying that she can't wait until the day that she is fired or leaves [CVS].'"[43]

On November 14, 2012, Cerni and Vucson planned to coach and counsel plaintiff about her "ongoing performance issues[.]"[44]  Vucson "prepared three Coaching and Counseling documents to deliver to" plaintiff that addressed "her:  1) inappropriate behavior toward her co-workers which created a difficult working environment; 2) failure to perform the minimum requirements of her position to run the pharmacy; and 3) failure to properly handle controlled substances in violation of CVS and regulatory policy."[45]  Cerni avers that "[a]t the beginning of the meeting, [p]laintiff advised Vucson and I that she was sick and she went to restroom."[46]  Cerni avers that when plaintiff returned, they

---

[43]Declaration of Brad Dudley (dated March 3, 2015) at 2, ¶ 4 and Exhibit 3 thereto, Exhibit B, Defendant's Motion for Summary Judgment, Docket No. 43.

[44]Cerni Declaration (dated February 27, 2015) at 2, ¶ 4, Exhibit D, Defendant's Motion for Summary Judgment, Docket No. 43.

[45]Vucson Declaration (dated March 3, 2015) at 2, ¶ 4, and Exhibit 1 thereto, Exhibit E, Defendant's Motion for Summary Judgment, Docket No. 43.

[46]Cerni Declaration (dated February 27, 2015) at 2, ¶ 4, Exhibit D, Defendant's Motion for Summary Judgment, Docket No. 43.

counseled plaintiff but she refused to sign the forms and that she asked to be allowed to go home and that she also asked to be fired.[47]   Cerni contends that plaintiff stated "why don't you just fire me... you know you want to.... are you chicken?"[48]   Plaintiff admits that she did talk about wanting to be fired but she denies that she asked Cerni whether he was "too chicken" to fire her.[49]   Cerni did tell plaintiff it would be job abandonment if she left the coaching and counseling session when it appeared that she was well enough to continue.[50]   And Vucson confirmed that when plaintiff indicated that she felt sick at the end of the coaching session and that she wanted to go home, Cerni "replied that she did not appear to be sick enough to leave[.]"[51]   Vucson avers that before she and Cerni left the store, she "confirmed with another pharmacist that she could cover [p]laintiff's shift if [p]laintiff remained to[o] ill to work...."[52]   Plaintiff passed out in the employee lounge and after being awakened by the front store supervisor, she called 911 and was taken to the

---

[47]Id.

[48]Exhibit B at CVS 0162, Plaintiff's Response to Motion for Summary Judgment, Docket No. 49.

[49]Nganje Deposition at 217:4-13, Exhibit A, Plaintiff's Response to Motion for Summary Judgment, Docket No. 49.

[50]Exhibit B at CVS 0590, Plaintiff's Response to Motion for Summary Judgment, Docket No. 49.

[51]Id. at CVS 0633.

[52]Vucson Declaration (dated March 3, 2013) at 2, ¶ 4, Exhibit E, Defendant's Motion for Summary Judgment, Docket No. 43.

hospital by ambulance.[53]  Cerni and Vucson received voicemail messages from plaintiff's husband "stating that [they] had locked Annette in the office and that she was in the hospital in hypertensive crisis because of it."[54]  Cerni contends that Vucson "reached out to [plaintiff's] husband to make sure she was ok and he did not return the call."[55]  Plaintiff contends that her husband never received any calls from Vucson.

On November 21, 2014, Cerni "visited [p]laintiff's store and conducted a 'reindeer run' with ... Mott, as I am required to do by CVS to evaluate a store's readiness for the holiday season."[56]  Cerni "noticed that the pharmacy department was 'staging' medication to be put away on a front bay in direct view of the customer[s] instead of leaving it in a tote[] and putting it away."[57]  Cerni avers that he

> attempted to discuss the pharmacy's cleanliness with [p]lain-
> tiff, but she directed me to speak with a Pharmacy Technician
> about the problem.  I explained that, as the pharmacist on
> duty, it was her job to maintain cleanliness and appearance of
> the pharmacy, but [p]laintiff refused to follow my directive.  I
> advised [p]laintiff that I was going to arrange to meet with her

---

[53]Exhibit B at CVS 0156, Plaintiff's Response to Motion for Summary Judgment, Docket No. 49.

[54]Id. at CVS 0162.

[55]Id.

[56]Cerni Declaration (dated February 27, 2015) at 2, ¶ 5, Exhibit D, Defendant's Motion for Summary Judgment, Docket No. 43.

[57]Email from Cerni to Dudley, Exhibit 2, Cerni Declaration (dated February 27, 2015), Exhibit D, Defendant's Motion for Summary Judgment, Docket No. 43.

> for further coaching and counseling.  Plaintiff began stating that I was harassing her and that she was going to call the police, at which point I left the pharmacy.[58]

Plaintiff testified that she was on the phone when Cerni complained about the medication that had been delivered not being put away and that she told him she would take care of it but that he could talk to the pharmacy tech about it if he wanted it done right away.[59]

On November 22, 2012, plaintiff contacted the CVS ethics line to lodge a complaint against Cerni.[60]  Plaintiff reported that

> [d]uring [the November 14] meeting I went to the bathroom and vomited twice again.  I remembered be[ing] told about work duties I did not perform when the PIC and Lead Techni-cian were on vacation and difficulties to work with some technicians.  John Cerni handed me papers to read regarding these issues.  I told him I am sick and could not read well at that time.  He mocked ... me by saying, "I thought you were going to say that, and you look good to me."  I suggested he let me go home because I was feeling very sick and he refused. He said, it will be considered abandonment if I leave.  I then suggested he should fire me because I was feeling very dizzy and sick and need[ed] to rest.  Again, he said, " no stay in the employee l[ounge] until you are ready to go back to work."  At about 10:26 am, I went back to the Manager's office and requested I get my personal belongings from the pharmacy

---

[58]Cerni Declaration (dated February 27, 2015) at 2, ¶ 5, Exhibit D, Defendant's Motion for Summary Judgment, Docket No. 43.

[59]Nganje Deposition at 223-225, Exhibit A, Plaintiff's Response to Motion for Summary Judgment, Docket No. 49.

[60]Nganje Deposition at 234:21-22, Exhibit A, Defendant's Motion for Summary Judgment, Docket No. 43.

and he said no. "what makes you think I will let you do that."
My bag had my medication and feminine supplies.... After
about an hour, I was [woke] up by the front store Supervisor,
not knowing when I passed out. I was very dizzy and felt my
blood pressure was very high. I cried and honestly t[hought]
I could have died in there. I called 911 immediately and the
ambulance came and took me to the emergency room at
Gilbert hospital. My blood pressure was above 200 and I was
diagnosed with dehydration, vomiting and hypokalemia....
John Cerni has been unfair, intimidating and disrespectful to
me on several other occasions, creating a hostile work environ-
ment. He ha[s] solicited erroneous information from techni-
cians and other employees and wrote me up then adjusted his
write-up ... after discussing the facts with me. He interfered
with my annual evaluation that my immediate supervisor
should conduct and refused me a pay raise in 2012. He had
threatened to fire me (e.g., in February 2012) regarding a faulty
customer complaint that did not follow federal, state, and CVS
narcotic policies. I was forced to take a leave of absen[ce] and
lost pay for about several months because he did not follow
correct procedure to transfer my immigration papers from
Minnesota to Phoenix. Yesterday, November 21, 2012 John
Cerni w[alked] into our store with several other CVS employ-
ees and threatened to write me up again in front of my
customers, technicians, and the store manager for the "load"
being staged by my technician. However, he did not care to
ask or understand that the load was not put away by the prior
shift as is the custom. My technician and I came to work that
morning and had to hurriedly stage the load in order to serve
incoming customers effectively and gradually complete this
task during the day. I had to call the police because he was
right in my face, creating a hostile work environment.[61]

---

[61]Exhibit B at CVS 0155-57, Plaintiff's Response to Motion for Summary Judgment,
Docket No. 49.

Plaintiff sent a copy of her Ethics complaint to Cerni, Vucson, and Dudley.[62] Plaintiff also sent them a copy of the complaint she intended to file with the EEOC.[63]

On December 4, 2012, a dentist complained that plaintiff was rude and unprofessional when dealing with him and one of his patients.[64]

On December 20, 2012, plaintiff filed her EEOC charge of discrimination.[65] Plaintiff alleged that she had "been subjected to harassment and [a] hostile work environment by John Cerni" because of her race, color, and national origin.[66]

On December 28, 2012, another pharmacist complained to Vucson about plaintiff's failure to get prescriptions filled during her shift.[67] On December 28, 2012, Cerni sent Vucson an email of six items concerning plaintiff that he wanted her to work with Dudley on deciding what to do next.[68] Cerni also sent an email to Dudley, in which he wrote that

---

[62]Id. at 0157.

[63]Id. at 0158.

[64]Exhibit 5 at CVS 0648, Dudley Declaration (dated March 3, 2015), Exhibit B, Defendant's Motion for Summary Judgment, Docket No. 43.

[65]Exhibit A, First Amended Complaint, Docket No. 20.

[66]Id.

[67]Exhibit 5 at CVS 0649, Dudley Declaration (dated March 3, 2015), Exhibit B, Defendant's Motion for Summary Judgment, Docket No. 43.

[68]Id. at CVS 0650.

"Annette is working at other stores and we are seeing the same issues there as well.  I am concerned for patient safety here."[69]

On December 30, 2012, Vucson sent an email to Cerni and Dudley about two drug loss notifications.[70] Vucson reported that she had asked plaintiff to follow up by December 26, 2012, but that she still had not heard from plaintiff.[71]

On December 31, 2012, Lupe Lopez, the pharmacy manager, sent a lengthy email to Cerni and Vucson complaining about plaintiff's disrespectful attitude and inability to get her work done during her shift.[72]  In response to Lopez's email, Steve Barney advised Dudley that "[w]e need to take action against Annette because operationally this just does not work."[73]  On December 31, 2012, Cerni also sent an email to Dudley in which he wrote "I am seriously concerned about patient safety issues and feel that Annette is not coachable."[74]

---

[69]Id. at CVS 0649.

[70]Id. at CVS 0651.

[71]Id.

[72]Id. at CVS 0653-54.

[73]Id. at CVS 0653.

[74]Id. at CVS 0652.

On January 3, 2013, Lopez sent another email complaining about plaintiff not getting her work done.[75] On January 3, 2013, Cerni sent an email to Dudley after visiting plaintiff's store to report that plaintiff had worked the evening shift the night before and "the pharmacy was back logged with prescriptions and there were multiple angry customers who came back to pick up and their prescriptions were not ready."[76] Cerni also reported that one of the pharmacy technicians "stated that if he had to work with Annette for another shift he would quit" and that the "pharmacy manager broke down and said that she cannot handle everything that her partner is not following up on and leaving ... for her for the next day."[77]

On January 10, 2013, Vucson "sent Dudley a summary ... which noted [p]laintiff's performance deficiencies includ[ing] ... insubordination, ongoing customer service issues, leaving work to be completed by others, calling out sick for her scheduled shifts without making any effort to arrange coverage, failing to engage in mandatory counseling for prescriptions, and failing to follow CVS and regulatory policies for controlled substances."[78]

---

[75]Id. at CVS 0658.

[76]Id. at CVS 0656.

[77]Id.

[78]Vucson Declaration (dated March 3, 2015) at 2-3, ¶ 5 and Exhibit 3 thereto, Exhibit

(continued...)

On January 22, 2013, Dudley and Vucson planned to give plaintiff another coaching and counseling.  They both aver that "[b]efore we could present [p]laintiff with the Coaching and Counseling, she walked out of the pharmacy and resigned her employment with CVS."[79]  Plaintiff testified that Dudley and Vucson "brought [up] the controlled substance issue that had been resolved and they brought a log-in issue, because I had a new computer where you have to log in on counseling.  They brought log-in counseling for pharmacists that were helping in our store and said they were mine and they were not mine.  So, again, it was erroneous information...."[80]

Plaintiff contends that she was entitled to a bonus for 2012, but that she did not get one, even though the pharmacist in charge at her store got a bonus.[81]

In June 2013, plaintiff moved to North Dakota where her husband had been living and working since January 2013.[82]  Sometime thereafter, plaintiff became a licensed pharmacist in North Dakota.

---

[78](...continued)
E, Defendant's Motion for Summary Judgment, Docket No. 43.

[79]Id. at 3, ¶ 6; Dudley Declaration (dated March 3, 2015) at 3, ¶ 7, Exhibit B, Defendant's Motion for Summary Judgment, Docket No. 43.

[80]Nganje Deposition at 243:11-16, Exhibit A, Plaintiff's Response to Motion for Summary Judgment, Docket No. 49.

[81]Id. at 201:18-206:2.

[82]Nganje Deposition at 16:3-4, Exhibit A, Defendant's Motion for Summary Judgment, Docket No. 43.

Plaintiff received a right to sue letter on August 16, 2013. She commenced this action on November 14, 2013. In her amended complaint, plaintiff asserts Title VII disparate treatment, hostile work environment, and retaliation claims and a § 1981 claim.

Defendant now moves for summary judgment on all of plaintiff's claims.

<u>Discussion</u>

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to show that there is an absence of genuine issues of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, then the non-moving party must set forth specific facts showing that there is a genuine issue for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). In deciding a motion for summary judgment, the court views the evidence of the non-movant in the light most favorable to that party, and all justifiable inferences are also to be drawn in its favor. <u>Id.</u> at 255. "[T]he court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." <u>T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 631 (9th Cir. 1987).

The Ninth Circuit has "held in several cases that it should not take much for a plaintiff in a discrimination case to overcome a summary judgment motion." Nigro v. Sears, Roebuck and Co., 784 F.3d 495, 499 (9th Cir. 2015). "'This is because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record.'" Id. (quoting Chuang v. Univ. of Calif. Davis, Bd. of Trustees, 225 F.3d 1115, 1124 (9th Cir. 2000)). However, this does not mean that summary judgment is never appropriate in an employment discrimination case. See, e.g., Leong v. Potter, 347 F.3d 1117, 1125 (9th Cir. 2003) (affirming district court's grant of summary judgment on Leong's Title VII claims "because he cannot show that similarly situated employees were treated more favorably than he was treated" and because "he is unable to provide evidence that USPS's reason for terminating him was a pretext for discrimination").

Title VII  disparate treatment claim/§ 1981 claim

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, ... or national origin[.]" 42 U.S.C. § 2000e–2(a)(1).  Section 1981 prohibits "discrimination based on 'ancestry or ethnic characteristics....'" Fonseca v. Sysco Food Services of Ariz., Inc., 374 F.3d 840, 850 (9th Cir. 2004) (quoting St. Francis Coll. v. Al–Khazraji, 481 U.S. 604, 613 (1987)).  "Analysis of an employment discrimination claim

under § 1981 follows the same legal principles as those applicable in a Title VII disparate treatment case."  Id.

"Disparate treatment occurs 'where an employer has treated a particular person less favorably than others because of a protected trait.'"  Wood v. City of San Diego, 678 F.3d 1075, 1081 (9th Cir. 2012) (quoting Ricci v. DeStefano, 557 U.S. 557, 577 (2009)).

> In responding to a summary judgment motion in a Title VII disparate treatment case, a plaintiff may produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the defendant's decision, or alternatively may establish a prima facie case under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).

Dominguez-Curry v. Nevada Transp. Dep't, 424 F.3d 1027, 1037 (9th Cir. 2005).

Although plaintiff's counsel appeared to suggest otherwise at oral argument, plaintiff did not argue in her briefing that she had any direct evidence of discriminatory intent.  Rather, she argues that she has come forward with sufficient circumstantial evidence of discriminatory intent to defeat defendant's motion for summary judgment. Plaintiff contends that this circumstantial evidence includes the fact that she was the only black pharmacist in her district; the fact that she was denied pharmacy technicians when other non-black, non-African pharmacists were provided them upon request; the fact that she was not allowed to close the drive-through window when things got busy but the white pharmacist who replaced her was allowed to do so; the fact that she was disciplined

for everything connected with the pharmacy even though there was another pharmacist and several pharmacy technicians working in the pharmacy; and the fact that she did not receive her 2012 bonus even though other non-black, non-African pharmacists at the two stores were she worked received their bonuses.

Most of these "facts" are not, however, supported by evidence. Plaintiff <u>believes</u> she was the only black, African pharmacist in her district, but plaintiff has no evidence to support this belief. Contrary to plaintiff's contention, defendant did not admit that plaintiff was the only black, African pharmacist in her district. In her interrogatories, plaintiff asked defendant to identify any black, African pharmacists who were supervised by Cerni, but defendant raised numerous objections to these interrogatories and declined to answer them.[83] However, in Requests for Admission Nos. 11 and 12, plaintiff asked defendant to admit that she was the only black pharmacist and the only African pharmacist in the CVS district in which she worked and defendant denied these requests for admission.[84] Moreover, defendant has offered the declaration of Brad Dudley, the "Human Resources Business Partner" for defendant's stores in Arizona and New Mexico, who avers that "[d]uring her employment with CVS as a Pharmacist at Store No. 1719, [p]laintiff was not

---

[83]Exhibit B at 14-15, Plaintiff's Response to Motion for Summary Judgment, Docket No. 49.

[84]<u>Id.</u> at 6.

the only black, African Pharmacist employed by CVS in Region 52, District 4, which contained Store No. 1719."[85]

Similarly, there is no evidence to support plaintiff's contention that other pharmacists were given additional assistance when they asked for it.  Plaintiff testified that she asked for additional help and never received it.  But, she did not testify that other pharmacists were given additional pharmacy technicians upon request.[86]  There is simply no evidence in the record that non-black, non-African pharmacists were given additional technicians if they requested them.

There is also no evidence to support plaintiff's contention that other employees in the pharmacy were not disciplined.  Plaintiff may have believed that she was the only pharmacy employee in her store being disciplined, but she has offered no evidence to support this belief.

As for the 2012 bonus, there is no dispute that plaintiff did not receive a bonus for 2012.  Plaintiff testified that she believed she should have received a bonus for 2012 because her pharmacist in charge received a bonus and bonuses were based on the pharmacy's

---

[85]Dudley Declaration (dated May 1, 2015) at 1-2, ¶¶ 1-2, Exhibit A, Defendant's Reply Memorandum [etc.], Docket No. 51.

[86]Nganje Deposition at 96:6-22 & 206:12-25, Exhibit A, Plaintiff's Response to Motion for Summary Judgment, Docket No. 49.

customer service scores, which were excellent in 2012.[87]   However, Cerni and Vucson both aver that "because [p]laintiff resigned from her employment on January 22, 2013, prior to the date that the end-of-year bonus is paid, she would not have been eligible to receive one for 2012."[88]   And even if plaintiff had been entitled to a 2012 bonus, Cerni, who is the individual that plaintiff alleges was acting with discriminatory intent, avers that "[a]s a District Manager, I was not responsible for determining whether a Pharmacist received an end-of-the-year bonus as those were determined by CVS' Corporate Department using year-to-date metrics."[89]   Plaintiff has offered no evidence to the contrary.   She has offered no evidence that Cerni was involved in the decision to not award her a bonus or somehow influenced defendant's decision to not award her a bonus for 2012.

As for the closing of the drive-through, plaintiff testified that on January 23, 2013, the day after she resigned, the drive-through window was closed but that when she was working for defendant "I was never allowed to close it.   If I closed it, I would have been

_____

[87]Id. at 201-206.

[88]Declaration of John Cerni (dated May 5, 2015) at 2, ¶ 5, Exhibit C; Declaration of Jennifer Vucson (dated May 5, 2015) at 2, ¶ 6, Exhibit D; Defendant's Reply Memorandum [etc.], Docket No. 51.

[89]Cerni Declaration (dated May 5, 2015) at 2, ¶ 3, Exhibit C, Defendant's Reply Memorandum [etc.], Docket No. 51.

fired[.]"[90]  This evidence is insufficient to create an genuine issue of  material fact as to

discriminatory intent.  Although a plaintiff needs very little circumstantial evidence if she

attempts to demonstrate discriminatory intent through such evidence, Pacific Shores

Properties, LLC v. City of Newport Beach, 730 F.3d 1142, 1159 (9th Cir. 2013), a plaintiff

must offer something more than her self-serving testimony.  The Ninth Circuit "has refused

to find a 'genuine issue'" of material fact "where the only evidence presented is 'uncorrobo-

rated and self-serving' testimony."  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061

(9th Cir. 2002) (quoting Kennedy v. Applause, Inc., 90 F.3d 1477, 1481 (9th Cir. 1996)).  All

plaintiff has offered here is her own testimony, which is not only self-serving and

uncorroborated but conclusory.  Plaintiff has presented no evidence as to how many times

she asked to close the drive-through window nor has she presented any evidence that she

ever specifically asked Cerni to do so and that he denied her request.  In addition, she has

presented no evidence that it was Cerni who allowed the pharmacist on January 23, 2013

to close the drive-through or anyone else's testimony to corroborate her testimony that the

drive-through window was in fact closed on January 23, 2013.

　　　　Plaintiff can also attempt to establish her disparate treatment claims through the

McDonnell Douglas burden-shifting framework.  "Under this analysis, plaintiff must first

establish a prima facie case of ... discrimination."  Hawn v. Executive Jet Mgmt., Inc., 615

---

　　　　[90]Nganje Deposition at 275:21-24, Exhibit A, Defendant's Motion for Summary
Judgment, Docket No. 43.

F.3d 1151, 1155 (9th Cir. 2010). "If plaintiff[] establish[es] a prima facie case, '[t]he burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action.'" Id. (quoting Chuang, 225 F.3d at 1123–24). "If defendant meets this burden, plaintiff[] must then raise a triable issue of material fact as to whether the defendant's proffered reasons ... are mere pretext for unlawful discrimination." Id.

To establish a prima facie case, plaintiff must show 1) that she was a member of a protected class, 2) that she was qualified for her job and performing her job satisfactorily, 3) that she experienced an adverse employment action, and 4) that similarly situated individuals outside her class were treated more favorably. Id. at 1156.

There is no dispute that plaintiff was a member of a protected class. Thus, plaintiff has met the first element of a prima facie case.

As for whether she was performing her job satisfactorily, the evidence shows that plaintiff received verbal and written counseling on numerous occasions during her employment with defendant, that plaintiff's customers and co-workers complained about her, and that she received a "needs improvement" evaluation in 2012. Although there is evidence that plaintiff received compliments from customers, this evidence is insufficient to create a question of fact as to whether plaintiff was performing her job satisfactorily. Given the discipline plaintiff received in 2010-2012 and the "needs improvement"

-26-

performance evaluation she received in 2012, no reasonable jury could conclude that she was performing her job satisfactorily, even though she received some compliments from customers.

Plaintiff also cannot meet the third element of her prima facie case. Plaintiff has alleged that she was constructively discharged and "[c]onstructive discharge is an adverse employment action for the purposes of Title VII."[91] Bauer v. Board of Supervisors, Case No. 01-15639, 2002 WL 1822328, at *4 (9th Cir. Aug. 8, 2002). "[C]onstructive discharge occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." Brooks v. City of San Mateo, 229 F.3d 917, 930 (9th Cir. 2000) (citation omitted).

Plaintiff argues that she has come forward with sufficient evidence to create an issue of fact as to whether she was constructively discharged. This evidence includes the disproportionate discipline she received such as Cerni attending her 2012 performance review, counseling her for correctly handling a drug-seeking customer, and never asking for her side of the story prior to a counseling. Plaintiff also contends that her discipline was

---

[91]Plaintiff does not have a free-standing constructive discharge claim, which would be a state law claim. Plaintiff's first amended complaint only alleges Title VII and § 1981 claims.

"stacked" in order to make her issues look worse.  Plaintiff also argues that Cerni's refusal

to allow her to go home when she was ill on November 14, 2012 and his coming into her

store just one week later and complaining about the cleanliness of the pharmacy suggest

that things had gotten so bad that she felt compelled to resign.  Plaintiff also points to the

fact that she did not get her 2012 bonus and makes much of the fact that she was

hospitalized after the November 14, 2012 counseling session and contends that her medical

issues were compounded by never knowing when she would be attacked for some alleged

performance deficiency.  Against this backdrop, plaintiff argues that a reasonable jury

could conclude that when on January 22, 2013, she was confronted with yet another

counseling for issues that had been resolved, she had "simply had enough" and could not

"take it anymore."  Draper v. Coeur Rochester, Inc., 147 F.3d 1104, 1110 (9th Cir. 1998).

But, there is no evidence that the discipline that plaintiff was receiving was

disproportionate, and plaintiff was given a chance to provide her side of the story during

at least some of the coaching and counseling sessions.[92]  In addition, there is evidence that

plaintiff's was not the only review that Cerni attended in 2012, although hers may have

been only one he attended for  a Store 1719 employee.  And while it may have been

questionable for Cerni not to let plaintiff go home on November 14, 2012, one incident is

insufficient to support a constructive discharge claim.  See Wunderly v. S.C. Johnson & Son,

---

[92]See, e.g., Exhibit 20 at CVS 120-123, Nganje Deposition, Exhibit A, Defendant's
Motion for Summary Judgment, Docket No. 43.

Inc., 828 F. Supp. 801, 806 (D. Or. 1993) (internal citations omitted) ("a single isolated incident may fail as a matter of law to support a claim of constructive discharge. Generally, courts look for evidence of either aggravating circumstances or a continuous pattern of discriminatory treatment"). Moreover, as will be discussed below, plaintiff cannot defeat defendant's motion for summary judgment on her hostile work environment claim, and a constructive discharge claim "requires some aggravating factors" beyond those that would support a hostile work environment claim. Brooks, 229 F.3d at 930-31. Here, plaintiff has relied on the same evidence to support both her hostile work environment claim and constructive discharge claim and what is missing from that evidence is anything that suggests that Cerni's conduct was based on plaintiff's race, color, or national origin.

But even if plaintiff made out a prima face case of discrimination, which she has not, defendant has articulated a legitimate non-discriminatory reason for its actions, namely that plaintiff was repeatedly failing to meet performance expectations. The burden would then shift to plaintiff to show that this reason was pretext for discrimination. "To show pretext using circumstantial evidence, a plaintiff must put forward specific and substantial evidence challenging the credibility of the employer's motives." Vasquez v. City of Los Angeles, 349 F.3d 634, 642 (9th Cir. 2003).

Plaintiff may be attempting to argue that the circumstantial evidence discussed above is evidence of pretext. But as discussed above, none of this evidence indicates any

discriminatory intent.  Moreover, even if plaintiff were the only black, African pharmacist in her district as she contends, plaintiff "has offered no evidence that this is anything more than a coincidence."  White v. AKDHC, LLC, 664 F. Supp. 2d 1054, 1069 (D. Ariz. 2009).  In addition, Cerni is entitled to the same actor inference because he was involved in plaintiff's transfer to Arizona and he is the individual whom plaintiff alleges discriminated against her.  "'[W]here the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive.'"  Id. (quoting Bradley v. Harcourt, Brace & Co., 104 F.3d 267, 270–71 (9th Cir. 1996)).  "This presumption has been applied even where the adverse employment action did not rise to the level of a termination and where the time difference between the hiring and the adverse employment action was three years."  Id. at 1070.  "The inference is based upon the principle that an employer's initial desire to hire an employee is 'strong evidence that the employer is not biased against the protected class to which the employee belongs.'"  Id. (quoting Coghlan v. American Seafoods Co. LLC., 413 F.3d 1090, 1096 (9th Cir. 2005)).  "The plaintiff must therefore make an 'extraordinarily strong showing of discrimination' to rebut the presumption and avoid summary judgment.'"  Id. (quoting Coghlan, 413 F.3d at 1096).  Plaintiff has made no such showing here.

In sum, plaintiff has no direct or circumstantial evidence of discriminatory intent. She has failed to a make out a <u>prima facie</u>, but even if she had, defendant has articulated a legitimate, nondiscriminatory reason for it actions, and plaintiff has no evidence of pretext. Thus, defendant is entitled to summary judgment on plaintiff's Title VII disparate treatment and § 1981 claims.

<u>Title VII hostile work environment claim</u>

> "An employer is liable under Title VII for conduct giving rise to a hostile environment where the employee proves (1) that [s]he was subjected to verbal or physical conduct of a harassing nature, (2) that this conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."

<u>Kortan v. California Youth Authority</u>, 217 F.3d 1104, 1109 (9th Cir. 2000) (quoting <u>Pavon v. Swift Trans. Co.</u>, 192 F.3d 902, 908 (9th Cir. 1999)). The "'objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" <u>Id.</u> (quoting <u>Montero v. AGCO Corp.</u>, 192 F.3d 856, 860 (9th Cir. 1999)). In order to determine whether the alleged objectionable conduct is sufficiently severe or pervasive, "courts consider all the circumstances, including the frequency of the allegedly discriminatory conduct, its severity, and whether it unreasonably interferes with an employee's work performance." <u>Surrell v. California Water Service Co.</u>, 518 F.3d 1097, 1109 (9th Cir. 2008). "Simply causing an

employee offense based on an isolated comment is not sufficient to create actionable harassment under Title VII." McGinest v. GTE Service Corp., 360 F.3d 1103, 1113 (9th Cir. 2004). "However, the harassment need not cause diagnosed psychological injury." Id. "It is enough if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position." Id. (citation omitted).

Plaintiff argues that she has come forward with sufficient evidence to defeat defendant's motion for summary judgment on her hostile work environment claim. Plaintiff argues that it is sufficient that she has shown that she, as a member of a protected class, was subjected to disproportionate discipline.  See Morgan v. National Railroad Passenger Corp., 232 F.3d 1008, 1017 (9th Cir. 2000), reversed in part on other grounds by National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 (2002) (evidence of hostile work environment included "the decision to hire Morgan at a lower grade than others, Morgan's multiple disciplines and denial of training, the use of racially derogatory language, and the overall racially-laden environment").  Plaintiff argues that she has cited several examples of disproportionate discipline such as Cerni attending her 2012 performance review, counseling her for correctly handling a drug-seeking customer, and never asking for her side of the story prior to counseling.  Plaintiff also contends that her discipline was "stacked" in order to make her issues look worse and that such "stacking" is evidence of

discriminatory intent.  See Costa v. Desert Palace, Inc., 299 F.3d 838, 860 (9th Cir. 2002) ("stacking" of employee's personnel file was discriminatory treatment).

Plaintiff also argues that Cerni's refusal to allow her to go home when she was ill on November 14, 2012 and his coming into her store just one week later and complaining about the cleanliness of the pharmacy suggest that her work environment was hostile. Plaintiff also argues that the fact that she did not get her 2012 bonus is evidence of a hostile work environment.  And, plaintiff argues that further evidence of a hostile work environment is that all of these actions occurred in the context of her being the only black, African pharmacist in her district.

As discussed above, many of the "facts" that plaintiff is relying on to support her hostile work environment claim are not supported by evidence.  Plaintiff was not the only black, African pharmacist in her district and she was not improperly denied a bonus for 2012.  And even assuming that she was subjected to disproportionate discipline, there is not any evidence that suggests that Cerni was disciplining plaintiff because of her race, color, or national origin.  The same is true of Cerni's refusal to let her go home on November 14.  To survive summary judgment on her hostile work environment claim, plaintiff has to have some evidence that she was subjected to conduct of a racial nature or that Cerni's conduct was based on her color or national origin.  None of the evidence plaintiff cites to suggest this.  Plaintiff's work environment may have been unpleasant and

she may have subjectively believed that her work environment was hostile, but no reasonable jury, when viewing the facts in a light most favorable to plaintiff, could conclude that plaintiff's environment was objectively hostile.  Thus, defendant is entitled to summary judgment on plaintiff's hostile work environment claim.

Title VII retaliation claim

"To make out a prima facie case of retaliation, [plaintiff] must establish that [she] undertook a protected activity under Title VII, h[er] employer subjected h[er] to an adverse employment action, and there is a causal link between those two events." Vasquez, 349 F.3d at 646.  "[A]n action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity." Ray v. Henderson, 217 F.3d 1234, 1243 (9th Cir. 2000).  To establish the causal link, plaintiff  must show "that ... her protected activity was a but-for cause of the alleged adverse action by the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013).  "If a plaintiff has asserted a prima facie retaliation claim, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision.  Ray, 217 F.3d at 1240.  "If the defendant articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive." Id.

Plaintiff has met the first element of her prima facie case of retaliation.  It is undisputed that plaintiff engaged in a protected activity when she filed her Charge of

Discrimination on December 20, 2012.  Plaintiff's internal complaint to the Ethics Hotline on November 22, 2012 was also protected activity.  See E.E.O.C. v. Go Daddy Software, Inc., 581 F.3d 951, 963 (9th Cir. 2009) (internal complaints employee made to human resources were protected activity).

As to the second element, plaintiff contends that the January 22, 2013 discipline was an adverse employment action.  While unwarranted discipline may be an adverse employment action, any discipline that Vucson and Dudley intended to give plaintiff on January 22, 2013 was not unwarranted.  Although plaintiff contends that Vucson and Dudley brought up the controlled substance issue, an issue that was already resolved, that issue was not the only basis for the discipline.  Vucson and Dudley were also disciplining plaintiff for customer complaints, complaints from co-workers, and insubordination.  The evidence in the record shows that these were legitimate performance issues and the only evidence to the contrary is plaintiff's self-serving testimony.

Plaintiff also contends that not receiving a bonus for 2012 based on her store's pharmacy customer service scores was an adverse employment action.  "[H]owever, [a] loss of a bonus is not an adverse employment action ... where the employee is not automatically entitled to the bonus." Rabinovitz v. Pena, 89 F.3d 482, 488-89 (7th Cir. 1996).  Although plaintiff testified that she believed she should have received a bonus for 2012 because her pharmacist in charge received a bonus and the bonuses were based on the

pharmacy's customer service scores,[93] plaintiff has provided no corroborating evidence that she was automatically entitled to a bonus for 2012, and, as discussed above, plaintiff resigned her employment before any 2012 bonus would have been paid out.

Plaintiff also contends that it was an adverse employment action that Cerni was soliciting negative statements about her and that the pharmacy managers were scrutinizing her work in order to find mistakes. This contention is based on plaintiff's testimony that from November 22, 2012 through January 22, 2013, Cerni and Vucson "came in frequently, and they stood around and they didn't write me up. They observed what I was doing, took notes, and wrote me up later."[94] It is also based on plaintiff's testimony that after she filed her EEOC Charge she was "informed by Stephanie Solomon that John Cerni had approached her that she should ... tell [Cerni] what Annette did wrong, so I can know. Write it in a formal paper and give it to me."[95]

But, plaintiff's own self-serving testimony is insufficient to create a genuine issue of material fact. Villiarimo, 281 F.3d at 1061. Plaintiff has offered no evidence to corroborate her testimony that Cerni was soliciting negative comments or that Vucson, Cerni, or Dudley were "hyper-scrutinizing" her job performance.

---

[93]Nganje Deposition at 201-206, Exhibit A, Plaintiff's Response to Motion for Summary Judgment, Docket No. 49.

[94]Id. at 237:20-25.

[95]Id. at 258:1-12.

Plaintiff has failed to make out a prima facie case of retaliation because she has not shown that she suffered an adverse employment action. But even if plaintiff has made out a prima facie case of retaliation, which she has not, defendant has articulated legitimate reasons for the January 2013 discipline and for plaintiff not receiving a bonus. The burden would then shift to plaintiff to show that these reasons were pretext for retaliation.

Plaintiff seems to argue that there is evidence of pretext in the form of the emails that Vucson, Cerni, and Dudley were exchanging in December 2012 and January 2013, in which they were documenting her "alleged" performance issues.[96] In particular, plaintiff points to the email that Steve Barney sent to Dudley in which Barney stated that "[w]e need to take action against Annette as operationally this just does not work."[97] Plaintiff seems to be suggesting that a reasonable inference to draw from these emails is that Cerni, Vucson, and Dudley were setting her up for the January 22, 2013 discipline and doing so in retaliation for her protected activity.

However, the Barney email does not show a retaliatory intent. Barney clearly stated that he was concerned about the operations of the pharmacy and not plaintiff's protected activity. In addition, the email was in response to an email from Lopez, the pharmacy manager, who had again complained to Cerni and Vucson about plaintiff being

---

[96]Exhibit B at CVS 0172-73 & 0177-86, Plaintiff's Response to Motion for Summary Judgment, Docket No. 49.

[97]Id. at CVS 0177.

disrespectful and not getting her work done in a timely manner.  There is no evidence that Lopez was aware of plaintiff's protected activity.  The other emails to which plaintiff cites do not suggest that Cerni and Vucson were retaliating against plaintiff because of her protected activity.  Defendant had repeatedly reprimanded plaintiff <u>prior</u> to her filing her EEOC Charge and "[a]n employer is not and should not be required to 'back off' from its pursuit of performance-related concerns merely because an employee has brought charges of discrimination under Title VII."  <u>Garner v. Motorola, Inc.</u>, 95 F. Supp. 2d 1069, 1080 (D. Ariz. 2000).

Plaintiff has failed to make out a <u>prima facie</u> case of retaliation, but even if she had, she has no evidence of pretext.  Thus, defendant is entitled to summary judgment on her Title VII retaliation claim.

<u>Conclusion</u>

Defendant's motion for summary judgment[98] is granted.  The clerk of court shall enter judgment dismissing plaintiff's amended complaint with prejudice.

DATED at Anchorage, Alaska, this 10th day of July, 2015.

/s/ H. Russel Holland<br>United States District Judge

---

[98]Docket No. 43.

-38-